In the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
John C. WIDULE, Attorney at Law:

OFFICE OF LAWYER REGULATION, Complainant-
Respondent,

v.

John C. WIDULE, Respondent-Appellant.

Supreme Court

*No. 01–2157–D. Oral argument March 6, 2003.—Decided
May 8, 2003.*

2003 WI 34

(Also reported in 660 N.W.2d 686.)

For the respondent-appellant there were briefs by *John C. Widule,* Elm Grove, and oral argument by *John C. Widule.*

For the complainant-respondent there was a brief by *Robert G. Krohn* and *Roethe, Krohn, Pope, McCarthy & Haas, LLP,* Edgerton, and oral argument by *Robert G. Krohn.*

¶ 1. PER CURIAM. Attorney John C. Widule has appealed from the referee's findings of fact and conclusions of law entered after a public hearing following the filing of the Office of Lawyer Regulation's (OLR) complaint on August 10, 2001, alleging that Widule had committed four acts of professional misconduct:[1]

---

[1] Effective October 1, 2000, Wisconsin's attorney disciplinary process was substantially restructured. The name of the body responsible for investigating and prosecuting cases involving attorney misconduct was changed from the Board of Attor-

Count 1: Widule had knowingly advanced a factual position without a basis for doing so that was not frivolous in violation of SCR 20:3.1(a)(2).[2]

Count 2: Widule took action on behalf of a client when it was obvious that such action would serve merely to harass or maliciously injure another, in violation of SCR 20:3.1(a)(3).[3]

Count 3: Widule had a conflict of interest in simultaneously representing two clients and himself in violation of SCR 20:1.7(b).[4]

---

neys Professional Responsibility to the Office of Lawyer Regulation (OLR) and the supreme court rules applicable to the lawyer regulation system were also revised in part. Although the conduct underlying this case arose prior to October 1, 2000, the complainant in this case will be referred to as the OLR but all references to supreme court rules will be to those in effect prior to October 1, 2000, unless otherwise noted in the opinion.

[2] SCR 20:3.1(a)(2) provides: "(a) In representing a client, a lawyer shall not: (2) knowingly advance a factual position unless there is a basis for doing so that is not frivolous."

[3] SCR 20:3.1(a)(3) provides:

(a) In representing a client, a lawyer shall not:

(3) file a suit, assert a position, conduct a defense, delay a trial or take other action on behalf of the client when the lawyer knows or when it is obvious that such an action would serve merely to harass or maliciously injure another.

[4] SCR 20:1.7(b) provides:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents in writing after consultation. . . . "

Count 4: Widule failed to provide competent representation in violation of SCR 20:1.1,[5] by failing to research issues and to thoroughly investigate the documentary and factual premises of the lawsuit he had commenced.

¶ 2. The referee appointed to hear this matter, Attorney Charles J. Herro, found that Widule had committed the misconduct alleged in Counts 1, 3 and 4—*i.e.,* that Widule had pursued a frivolous action, had a conflict of interest, and had failed to provide competent representation. The referee, however, absolved Widule of having acted maliciously. Referee Herro recommended that Widule, who was admitted to practice law in this state in 1982 and who has never before been the subject of a disciplinary proceeding, be suspended from the practice of law for a period of three months.

¶ 3. On this appeal Widule challenges each of the referee's findings and conclusions of misconduct; he also appeals from the referee's recommendation that his license to practice law be suspended for a period of three months. In essence, Widule maintains that there is no clear and satisfactory evidence to support the referee's conclusion that Widule had violated the three supreme court rules as alleged.

¶ 4. We determine that the referee's findings of fact and conclusions of law are supported by the satisfactory and convincing evidence presented at the hearing held in this disciplinary proceeding. We further determine that Widule's misconduct warrants a suspension of his license to practice law in this state for six months; in addition, we direct, as the referee recom-

[5] SCR 20:1.1 provides: "Competence. A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

mended, that Widule pay to the OLR all the costs connected with this disciplinary proceeding and appeal.

¶ 5. The events giving rise to these misconduct counts against Widule stem from his representation of Tim Ormson, d/b/a Ormson Financial Services (OFS). In December 1992 Northern Plastics Inc. was in default on obligations it owed to the Royal Bank of Elroy which held a general business security agreement on the assets and a first mortgage on the company's real property. The president of Northern Plastics, Larry Ormson, Tim Ormson's brother, negotiated a sale of the assets of the company to Royal Plastics, Inc., whose director and major shareholder was David Grams. The sale proposal contemplated that Northern Plastics would voluntarily surrender its assets to Royal Bank in lieu of foreclosure, and that those assets would then be distributed at the closing to individuals and entities who claimed security interests in those assets.

¶ 6. Tim Ormson, who claimed to hold a security interest in the assets of Northern Plastics, was given notice of his brother's company's planned voluntary surrender of assets. Dona Merg, the attorney representing the bank, sent notice of the closing to Tim Ormson including a termination statement on which Tim Ormson was to indicate the amount of money he would accept in settlement of OFS's interest in Northern Plastics' assets which were to be distributed at the scheduled closing on December 18, 1992. Tim Ormson did not attend that closing at which the assets of the plastics company were settled and allocated; instead, Tim's brother, Larry Ormson, appeared on Tim's behalf asserting that he had Tim's authority to do so. Larry Ormson brought with him the termination statement Tim had signed in blank; that termination statement identified no dollar amount that OFS would accept in

settlement. At that closing Larry Ormson agreed to accept on behalf of his brother Tim and OFS, the amount of $44,000; that amount was then inserted in the space that had been left blank on the settlement form. A check in that amount was subsequently mailed to Tim Ormson and he later cashed that check on behalf of OFS.

¶ 7. On December 15, 1994, Widule filed a complaint in the Dane County Circuit Court on behalf of his client, Tim Ormson, against Attorney Dona Merg and the Royal Bank of Elroy. That complaint asserted that Tim Ormson held a valid security interest in the assets of Northern Plastics and that the defendants had unlawfully defeated that interest at the settlement closing held on December 18, 1992. The complaint prepared by Widule asserted four causes of action on behalf of his client, Tim Ormson, including: unjust enrichment, conversion, breach of fiduciary duty by trustee, and uniform commercial code violations. Specifically, the complaint alleged that Tim Ormson, d/b/a OFS, had a valid security interest in the assets of Northern Plastics and that Tim Ormson had executed a satisfaction of his interest in blank in order to allow the closing to proceed. The complaint further alleged that Dona Merg, as the attorney for Royal Bank, and the bank, had caused Tim Ormson to terminate his security interest and satisfy a mortgage held on the assets and real property of Northern Plastics for an amount substantially less than Tim Ormson's claimed value of that security interest. According to the complaint the actual value of Tim Ormson's interest in the assets of Northern Plastics ranged from $185,000 to $245,000; the complaint further alleged that Dona Merg had agreed to hold in trust, for Tim Ormson, the settlement satisfaction. The complaint also alleged that Dona Merg had

improperly allocated from the plastics company assets only $44,000 to OFS and had assigned to Tim Ormson a second mortgage on Larry Ormson's home. Although this complaint was premised on the existence of a promissory note and security agreement, no promissory note or any other documentation were attached to the complaint to support Tim Ormson's claim that he had a valid security interest in the assets of Northern Plastics in excess of the $44,000 he had already been paid.

¶ 8. On January 23, 1995, Merg and the bank served Interrogatories asking Widule and Tim Ormson to produce documents or to identify any verbal communications to support the claim that Tim Ormson, d/b/a OFS, was entitled to at least a $185,000 settlement payout from Northern Plastics' assets. The defendants also sought documents that would establish any indebtedness by Northern Plastics, Inc., to Tim Ormson or OFS including such things as security agreements, original notes, etc. Widule, on behalf of Tim Ormson, declined to produce any documents, asserting that many of the requested documents were already in the possession of Merg or the bank.

¶ 9. The defendants filed a motion pursuant to Wis. Stat. § 804.01(3)(a)(2) (1995–96)[6] seeking a protective order precluding Widule and Tim Ormson from initiating any discovery until Tim produced written evidence confirming that he held any secured interest in the assets of Northern Plastics, Inc., which had not been paid or satisfied as a result of the closing on the voluntary transfer of assets held on December 18, 1992. At the March 9, 1995, hearing on that motion for a protective order, Widule, on behalf of Tim Ormson,

---

[6] All subsequent references to the Wisconsin Statutes are to the 1995–96 version unless otherwise indicated.

submitted an affidavit from one Paul Martin; in that affidavit, Martin averred that Dona Merg had telephoned him and asked him to retrieve OFS's file from his employer, Royal Plastics, the entity that had purchased Northern Plastics, Inc.'s assets. According to Martin's affidavit, Merg asked him to forward that file to her, and he did so. Based on that Widule argued that Tim Ormson could not produce evidence of any promissory notes or securities agreements because they were in that OFS file that Merg had already obtained from Martin.

¶ 10. Martin's affidavit was countered by an affidavit from Dona Merg in which she averred that she had never seen or possessed any promissory notes to OFS or security agreements involving OFS.

¶ 11. At the conclusion of the March 9, 1995, hearing the Dane County Circuit Court granted the defendants' motion for a protective order precluding Tim Ormson from initiating or conducting any discovery until he produced proof satisfactory to the court of the existence of a valid and properly perfected security interest in favor of OFS in Northern Plastics assets that would support his claim that OFS was entitled to more than the $44,000 OFS had already received following the December 18, 1992, closing.

¶ 12. By affidavit dated March 17, 1995, submitted in support of a motion asking the circuit court to reconsider its March 9, 1995, protective order, Tim Ormson averred that shortly after the circuit court hearing he had found the original business note and security agreement with Northern Plastics which established the value of his security interest greatly in excess of the $44,000 payout he had received. According to Tim Ormson those documents had been located behind a file cabinet in his home immediately after the

53

March 9, 1995, circuit court hearing and Tim Ormson attached those documents to his March 17, 1995, affidavit and asserted that they established that OFS had a $240,000 security interest in Northern Plastics' assets.

¶ 13. Tim Ormson also attached to that same affidavit a letter dated December 7, 1992, that his brother Larry Ormson had purportedly received from David Grams. In that letter David Grams wrote that he had reviewed the business notes and financing statements of Northern Plastics, and had discussed the matter with Attorney Merg; Grams wrote that Merg had offered to pay OFS at the upcoming closing a total of $185,000 which represented 75 percent of the plastics company's indebtedness to OFS. Grams' letter, which was signed "Dave," asserted that the $185,000 settlement offer was "very favorable for Tim." According to Widule he viewed Grams' letter as an outsider's confirmation that Dona Merg, in fact, had verbally acknowledged that Tim Ormson was entitled to a settlement amount greatly in excess of the $44,000 actually allocated at the closing.

¶ 14. As noted, Grams' December 7, 1992, letter was appended to Tim Ormson's March 17, 1995, affidavit. However, by affidavit dated April 12, 1995, David Grams denied that he had written or caused the December 7, 1992, letter to be authored; Grams asserted that he had not executed or signed the original of that document, and that the signature on that letter was not a true copy of his signature.

¶ 15. Despite Grams' affidavit disavowing that December 7, 1992, letter, 23 days later, on May 5, 1995, Widule, on behalf of Tim Ormson, filed an amended complaint against Dona Merg and the bank asserting claims of negligent and/or intentional breach of trust; negligent and/or intentional breach of fiduciary duty;

54

misappropriation and conversion of properties; unjust enrichment; negligence and breach of fiduciary duty by bank; fraud; violation of 12 U.S.C. 1972; failure to comply with Wis. Stat. §§ 409.504 and 409.507; breach of good faith under Wis. Stat. §§ 401.201(19) and 401.203; and, breach of contract. Attached to that amended complaint was a copy of that December 7, 1992, letter purportedly written by Grams.

¶ 16. Subsequently, at a circuit court hearing on June 26, 1995, Widule withdrew the Grams' letter. He later explained that until that time he thought that perhaps the Grams' letter had been signed by Grams' attorney on Grams' behalf.

¶ 17. Subsequently, at a November 1, 1997, deposition, Paul Martin admitted that his earlier statement that he had retrieved the OFS file from Royal Plastics and sent it to Dona Merg as she had requested, was false; according to Martin, Larry Ormson had paid him $500 to make that false claim implicating Merg and asserting that she already had the documents supporting Tim Ormson's claim for a share of Northern Plastics in excess of $44,000.

¶ 18. On March 4, 1998, the Dane County Circuit Court dismissed Tim Ormson's amended complaint against Merg and the bank with prejudice. The defendants' request for sanctions pursuant to Wis. Stat. § 814.025 against Widule and Tim Ormson for bringing a frivolous action was transferred to Dane County Circuit Court Judge Richard Callaway for resolution. After several days of hearings Judge Callaway on October 28, 1998, granted the defendants' motion for sanctions and entered judgment in favor of Dona Merg and Royal Bank of Elroy against John Widule personally in the amount of $102,373.75.

¶ 19. That ˚sanction was imposed on Judge Callaway's specific findings that Widule knew that his client, Tim Ormson, had previously accepted the $44,000 payment in satisfaction of OFS's claimed interest in Northern Plastics' business assets, that Tim Ormson had not objected to that amount, and in fact had cashed the check. In addition, the circuit court determined that Widule should have known that Tim Ormson had no promissory note or other documentation to support the existence of any larger security interest in Northern Plastics, and that Tim Ormson and Larry Ormson had colluded to produce fraudulent documents which Widule had then introduced in support of Tim Ormson's lawsuit against Merg and the bank.

¶ 20. Judge Callaway further determined that Widule had acted with malicious intent based on the fact that nearly two years had passed without Tim Ormson objecting to the settlement payout he had received from the Northern Plastics' voluntary surrender of assets. Then Widule filed Tim Ormson's lawsuit against Dona Merg and the bank the day after the bank and Merg had rebuffed Larry Ormson's attempt to repurchase the assets of Royal Plastics (Northern Plastics' successor) which was then in bankruptcy. David Stauffacher, who was also Widule's client, and Larry Ormson had submitted various offers to purchase Royal Plastics' assets out of bankruptcy but their efforts were unsuccessful because the bank declined to provide any financing to Larry Ormson.

¶ 21. Judge Callaway also determined that Merg's testimony had been credible, including her assertion that during the pendency of the Royal Plastics' bankruptcy, Widule had threatened to claim that Merg had known at the time of the Northern Plastics' settlement

56

closing that Larry Ormson had not been authorized to act on Tim Ormson's behalf at that closing.

¶ 22. Widule appealed. On April 12, 2000, the court of appeals, in Case No. 98–3313, affirmed Judge Callaway's imposition of sanctions against Widule finding that the record supported the finding that Widule had acted maliciously to harass Merg after Stauffacher's attempts to purchase Royal Plastics' assets failed. In that appeal, the court of appeals wrote:

> The trial court's finding that Widule had threatened Merg during the Royal Plastics' proceeding is not clearly erroneous, and supports the trial court's inference of malicious intent. Given Widule's improper motive for initiating the suit, it was not clearly erroneous for the trial court to also have found that Widule failed to adequately investigate the existence of [Tim] Ormson's claimed security interest in the Northern Plastics liquidation before filing suit the day after the Royal Plastics' assets were sold, and that the fraudulent nature of the documents which Ormson and his brother [Larry] conveniently produced when faced with a motion to dismiss ought to have been obvious. We agree with the trial court's resulting conclusion that initiating and maintaining suit based on a security interest which reasonable investigation would have revealed never existed, in order to harass an attorney who did not cooperate in another proceeding, violated Wis. Stat. § 814.025 and merited an award of sanctions against counsel.

*Ormson v. Merg,* No. 98–3313, unpublished order (Wis. Ct. App. April 12, 2000). Widule's petition for review in that case was subsequently denied by this court.

¶ 23. Judge Callaway later held a hearing on Widule's motion that a portion of the $102,000 in sanctions imposed against him should be allocated

against Tim Ormson. An amended judgment was then entered reducing the amount of sanctions against Widule personally to $77,000.

¶ 24. Widule again appealed. On April 26, 2001, the court of appeals, in Case No. 99–2616, affirmed that amended judgment against Widule. In that second appeal the appellate court addressed Widule's argument that all the sanctions should be allocated against Tim Ormson, and wrote:

> [Widule's] argument boils down to a claim he made on the previous appeal: that he should not have been sanctioned at all because he relied in good faith upon his client's assertions and did not know that documents his client produced were fraudulent. We have already considered this claim and decided it against Widule. We concluded that sanctions were appropriate under Wis. Stat. § 812.025 because Widule initiated and maintained a suit based on a security interest that reasonable investigation would have revealed never existed, in order to harass an attorney who did not cooperate in another proceeding. We will not revisit that ruling.

*Ormson v. Merg,* No. 99–2616, unpublished slip op., ¶ 4 (Wis. Ct. App. April 26, 2001).

¶ 25. On July 18, 2001, this court denied Widule's petition for review in Case No. 99–2616. Thereafter, the OLR filed its complaint against Attorney Widule in this court alleging the four counts of misconduct as described above.

■

¶ 26. On this appeal Widule asks this court to revisit the sanctions imposed against him by Judge Callaway; Widule urges this court to consider reopening the judgments against him because he believes Judge Callaway "made serious reversible [error] in the underlying litigation . . . ." We decline the invitation. The

determination that sanctions were appropriately imposed against Widule for violating Wis. Stat. § 814.025 by initiating and maintaining a suit based on the security interest which a reasonable investigation would have revealed never existed, in order to harass an attorney who did not cooperate in another proceeding, has been twice affirmed by the court of appeals, and this court has twice denied Widule's petitions for review. That determination may not now be collaterally attacked in this disciplinary proceeding. *In re Disciplinary Proceedings Against Lauer*, 108 Wis. 2d 746, 754, 324 N.W.2d 432 (1982).[7]

¶ 27. *Lauer* was a disciplinary proceeding against a lawyer charged with knowingly maintaining a frivolous action as proscribed by then SCR 20.36. Former SCR 20.36 is now found, in substantially the same form, in SCR 20:3.1, one of the rules the referee found that Widule had violated in this case.

¶ 28. In the *Lauer* case, Attorney Lauer had been ordered to pay costs and reasonable attorney's fees by a circuit court pursuant to Wis. Stat. § 814.025 (1979–80) for bringing a frivolous claim. The Board of Attorneys Professional Responsibility then filed a misconduct complaint against Lauer asserting that he had violated SCR 20.36 because he knew, or should have known, that the frivolous action he had commenced in circuit court was without any reasonable basis in law or equity and could not be supported by a good faith argument for the

---

[7] Collateral estoppel which is now known as issue preclusion, *Northern States Power Co. v. Bugher*, 189 Wis. 2d 541, 549, 525 N.W.2d 723 (1995), is applicable under appropriate circumstances in lawyer disciplinary matters to preclude relitigation of issues before a referee that were previously resolved in court. *See In re Disciplinary Proceedings Against Lucareli*, 2000 WI 55, 235 Wis.2d 557, 611 N.W.2d 754.

extension of modification or reversal of existing law. The referee appointed in *Lauer* recommended that a private reprimand be issued. Lauer appealed to this court arguing that the referee had improperly concluded that Lauer had violated SCR 20.36 solely on the basis of the previous determination by the circuit court that Lauer had violated the frivolous claim statute, § 814.025.

¶ 29. The *Lauer* court agreed that a finding of frivolousness under the statute could not, per se, constitute a violation of the disciplinary rule. It was pointed out that although the statute and the rule were similar, they were not identical, and the assessment of costs under the statute does not, in and of itself, constitute a violation of the rule of professional responsibility. The *Lauer* court explained:

> However, it does not follow that where there is a violation of the statute there must be a violation of the disciplinary rule. To the extent they treat the same activity, the statute and the rule differ significantly. A violation of the statute requires that a party or a party's attorney knew or should have known that the action, special proceeding, counter-claim, defense or cross-complaint was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law. A violation of SCR 20.36 requires that the claim or defense unwarranted under existing law must be *knowingly* advanced. . . .

108 Wis. 2d at 757 (emphasis in original).

¶ 30. Furthermore, the *Lauer* court noted that under the frivolous claim statute, the test applied is an objective one; in contrast, under the disciplinary rule, the appropriate test is a subjective one because the referee or reviewing court in a disciplinary action, must

determine whether an attorney has violated a disciplinary rule that sets forth the minimum level of conduct below which no lawyer can fall without being subject to disciplinary proceedings. In *Lauer,* the court wrote:

> In making that determination in the context of SCR 20.36(1)(b), we find it appropriate to apply the subjective standard, that is, *whether the attorney, in fact, knew the claim he was advancing was unwarranted* under existing law and could not be supported by a good faith argument for an extension, modification or reversal of existing law. Such knowledge is an issue of fact which in the context of an attorney disciplinary proceeding, must be established by clear and satisfactory evidence, . . . while a finding of frivolousness under § 814.025, Stats., must be based on a preponderance of the evidence . . . .

108 Wis. 2d at 758 (emphasis added and internal citations omitted).

¶ 31. Thus, in the instant matter, the focus of the inquiry before the referee, and now before this court with respect to the first count of the OLR's complaint against Widule, is whether there was clear and satisfactory evidence that Widule knowingly advanced a factual position without a basis for doing so that was not frivolous.

¶ 32. In this case Referee Herro in Finding of Fact #24 wrote:

> 24. The words frivolous and malicious have been the subject of discussion, definition and interpretation by our courts but remain subjective and dependent upon factual circumstances. Was the respondent [Widule] frivolous in pursuing the matter of Tom [sic] Ormson versus Merg, or was he a zealot on a

61

crusade? The Referee finds that a well-prepared attorney, not clouded by his contingent fee arrangement with a client who would pervert the facts, would recognize the frivolity of his pursuit. Pursuing the Tim Ormson matter after:

A. Tim finding an original business document which had been lost for 18 months,

B. The Grams recantation, and

C. The Martin bribery statement,

compels the Referee to find the actions of the Respondent to be frivolous.

¶ 33. We uphold this finding because there is clear and satisfactory evidence in the record to support it. The above quote reveals that the referee correctly recognized that the test to be applied is a subjective one. We find it significant, as did the referee, that Widule filed the first amended complaint to which he appended the December 7, 1992, letter purportedly written by David Grams, 23 days *after* Grams had executed an affidavit specifically denying that he had authored or signed that letter. Despite that disavowal Widule filed that first amended complaint using the Grams' letter as documentary support. We recognize that Widule subsequently withdrew that letter; however, he did not do so until June 26, 1995, more than two months after Grams' recantation affidavit was filed. We are troubled, and certainly unpersuaded, by Widule's specious argument that he did not act earlier to withdraw Grams' letter because until then, he thought that perhaps Grams' attorney had signed the December 7, 1992, letter on Grams' behalf. That claim is particularly unpersuasive in view of the signature "Dave" on that

62

letter. We think a lawyer signing a letter on behalf of a client would be unlikely to use such a casual or familiar diminutive.

¶ 34. We agree with the referee and find that the evidence in this record is sufficient to support a subjective determination that Widule knowingly advanced a factual position without a basis for doing so that was not frivolous. The referee's finding in this respect is supported by clear and convincing evidence and we adopt it.

¶ 35. Moreover, Widule's own testimony before the referee provides sufficient evidence that he knowingly advanced a factual position without a basis for doing so that was not frivolous. The transcript of the hearing before the referee on April 10, 2002, reveals that at the time he filed the first amended complaint with the Grams' letter attached, Widule knew that Grams had not written or signed that December 7, 1992, letter.[8] Widule admitted that despite that knowledge, he had attached the letter as an exhibit and foundation for the first amended complaint. This testimony, together with all the other evidence before the referee, constitutes clear and satisfactory evidence that Widule knowingly advanced a factual position without a basis for doing so that was not frivolous. Accordingly,

---

[8] The transcript of the hearing before the referee reflects the following exchange between the OLR's attorney and Widule on cross-examination.

Q:[By the OLR attorney]: Well, you knew Grams didn't write the letter?

A: [Widule]: I knew Grams did not sign or write the letter.

Q: And yet you attached the letter as an exhibit as a foundation for your first amended complaint?

A: Yes.

we find the evidence to be more than sufficient to support the referee's first conclusion of law that Widule violated SCR 20.3.1(a)(2).

■

¶ 36. We also find that there is clear and satisfactory evidence to support the referee's second conclusion that Widule violated SCR 20:1.7(b) by representing Tim Ormson while at the same time being under a retainer to another client—David Stauffacher—to the potential detriment of Stauffacher. As with respect to the first count, we find that there was clear and satisfactory evidence in the record to support this finding and conclusion.

¶ 37. The evidence before the referee established that David Stauffacher paid Widule a monthly retainer for his services which included, according to Widule, "business consulting services" and "ancillary legal services." In his deposition Stauffacher testified that the monthly retainer he paid Widule was for "legal services." Stauffacher had invested money in Northern Plastics and then later in Royal Plastics, the successor to Northern Plastics. When bankruptcy proceedings were subsequently commenced for Royal Plastics, Stauffacher and the Ormsons made several offers to purchase Royal Plastics' assets out of bankruptcy. Those offers were unsuccessful because all involved financing from the Royal Bank of Elroy and the bank refused to participate or finance any endeavor involving Larry Ormson.

¶ 38. Previously, at the December 1992 closing of the voluntary surrender of assets by Northern Plastics, a check had been issued to David Stauffacher, as a secured creditor of Northern Plastics, in the amount of $255,205.47. At the subsequent sanction hearing before Judge Callaway, Widule argued that Stauffacher had

been paid $5000 too much at that closing and that Stauffacher's interest was actually junior to that of Widule's other client, Tim Ormson. Widule maintained before Judge Callaway that the excess $5000 Stauffacher had received came directly from Tim Ormson's rightful share in the settlement payout of Northern Plastics' assets.

¶ 39. In his brief in this disciplinary proceeding Widule does not dispute that he made this argument before Judge Callaway; instead, he asserts that the OLR had not "very vigorously pursued . . . " that point before the referee. In any event, Widule maintains that there was no risk to David Stauffacher and David Stauffacher had, in fact, consented to Widule making that argument; finally Widule asserts that there was no conflict of interest by him simultaneously representing Tim Ormson and David Stauffacher.

■

¶ 40. We are not persuaded by these arguments. Although in his brief Widule repeatedly asserts that Stauffacher had consented "in writing" to Widule making this argument before Judge Callaway, there is no such written statement from David Stauffacher in the record before this court by which Stauffacher allegedly waived this apparent conflict.[9] We think that it is self-evident that when Widule argued before Judge Callaway that his client Stauffacher had received too

---

[9] At oral argument Widule acknowledged that he had no written consent from Stauffacher but claimed that he did not need it because he never took a position that was directly adverse to Stauffacher's interest. Widule maintained that there was no requirement of consent if there is no adverse representation; according to Widule, Stauffacher did not view this argument as being adverse to him. Widule noted that Stauffacher did not file a grievance against him.

much of the plastic company's assets and that the excess came from rightful share of his other client, Tim Ormson, that Widule had a conflict. Arguing a position favorable to one client, at the expense of another client, constitutes a detrimental position with respect to the first client. Widule could not reasonably believe that his responsibilities to his client Stauffacher were not, under these circumstances, materially limited by Widule's responsibility to his other client, Tim Ormson. *See* SCR 20:1.7(b)(1). We agree that there is clear and convincing evidence that Widule's actions in this respect violated SCR 20:1.7(b).

¶ 41. The referee also concluded that Widule had violated SCR 20:1.1 because Widule failed to provide competent representation to his client, Tim Ormson, by failing to research issues such as "accord and satisfaction," "waiver," and "estoppel," before filing suit on behalf of Tim Ormson. We need not engage in a detailed analysis of these legal doctrines and who has the burden of proof with respect to establishing them because even though these may be affirmative defenses, in order for Widule to have provided competent representation to Tim Ormson before commencing the underlying litigation against Dona Merg and the bank, Widule should have investigated the possibility that such defenses could defeat the action he was commencing. There is nothing in this record to establish that Widule even considered, let alone researched or analyzed, these issues before commencing the lawsuit on behalf of his client Tim Ormson.

¶ 42. In any event, it is unnecessary to now determine whether the evidence with respect to this third count was clear and convincing because we are persuaded that the evidence on the other two counts, as found by the referee, is overwhelming.

¶ 43. We turn now to the appropriate discipline to be imposed against Widule for his professional misconduct. In its complaint the OLR asked the referee to recommend a six-month suspension of Widule's license to practice law. Instead, the referee recommended only a three-month suspension. Widule does not specifically address the appropriateness of the recommended sanction because he maintains that no sanction at all should be imposed since he believes he committed no acts of professional misconduct. On the other hand, the OLR in its responsive brief asserts that given the serious nature of Widule's violations and the effects his actions had on other individuals, especially Dona Merg who has incurred substantial attorney fees defending against Ormson's lawsuit that remained pending several years before it was finally dismissed, an appropriate suspension penalty is warranted.

¶ 44. Although this court takes into account the referee's recommendation as to appropriate discipline, we do not accord the referee's recommendation any conclusive or great weight. It is this court's responsibility to determine the appropriate discipline to be imposed for an attorney's misconduct; in making that determination this court is free to impose discipline more or less severe than that recommended by the referee. *In re Disciplinary Proceedings Against Elliott,* 133 Wis. 2d 110, 394 N.W.2d 313 (1986).

¶ 45. In this case, in light of the seriousness of Widule's misconduct, we believe the three-month suspension recommended by the referee to be too lenient; instead, given the egregiousness of Widule's behavior in commencing and maintaining what was found to be a malicious and frivolous action pursued over a several year period, and in light of his admitted failure to pay

67

the sanctions ordered by the circuit court in the underlying litigation, and in light of Widule's misconduct in violation of at least two specific rules of professional responsibility, we conclude a minimum six-month suspension of Widule's license to practice law in this state is called for. We hope that that period of suspension will help Widule understand and accept the responsibilities of the legal profession and the ethical constraints placed upon its practice.[10]

¶ 46. The referee's conclusions that Widule's actions violated provisions of the Rules of Professional Conduct for Attorneys were based on findings of fact that are not clearly erroneous. The referee's findings of fact and conclusions of law regarding Widule's professional misconduct as established in this proceeding are proper, and we adopt them.

¶ 47. Under the totality of the circumstances, we determine that a six-month suspension of John C.

---

[10] We have not asked the parties to brief the issue of the appropriateness of increasing the sanction from that recommended by the referee. Although we have done so in several cases, there are also cases in which this court has increased the sanction recommended by the referee without first asking the parties to comment either by brief or order to show cause. *See, e.g. In re Disciplinary Proceedings Against Frank,* 206 Wis. 2d 233, 556 N.W.2d 717 (1996); *In re Disciplinary Proceedings Against Wentzel,* 204 Wis. 2d 285, 554 N.W.2d 669 (1996); *In re Disciplinary Proceedings Against Rutgers,* 176 Wis. 2d 811, 500 N.W.2d 673 (1993); *In re Disciplinary Proceedings Against Cook,* 164 Wis. 2d 484, 476 N.W.2d 18 (1991); *In re Disciplinary Proceedings Against Oppitz,* 157 Wis. 2d 266, 459 N.W.2d 569 (1990); and, *In re Disciplinary Proceedings Against Eisenberg,* 144 Wis. 2d 284, 423 N.W.2d 867 (1988). We have not asked for additional briefs in this case because the six-month suspension we now impose is consistent with what the OLR initially sought in its disciplinary complaint.

Widule's license to practice law is appropriate discipline for his misconduct. That six-month suspension will require him to petition this court for reinstatement under SCR 22.28(3).

¶ 48. IT IS ORDERED that the license of Attorney John C. Widule to practice law in Wisconsin is suspended for six months commencing June 27, 2003, as discipline for his professional misconduct.

¶ 49. IT IS FURTHER ORDERED that within 60 days of the date of this order, John C. Widule pay to the Office of Lawyer Regulation all the costs of this proceeding. If the costs are not paid within the time specified and absent a showing to this court of his inability to pay the costs within that time, the license of John C. Widule to practice in Wisconsin shall remain suspended until further order of the court.

¶ 50. IT IS FURTHER ORDERED that John C. Widule comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.